ELECTRONICALLY FILED
4/15/2021 3:01 PM
Heidi Percy
County Clerk
Snohomish County, WASH
Case Number: 21-2-01757-31

SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR SNOHOMISH COUNTY

| | |
|---|---|
| GERALD SIEGRIST, individually and on behalf of all others similarly situated; PATRICIA SIEGRIST, individually and on behalf of others similarly situated; | Case No.    21-2-01757-31 |
| Plaintiffs, | COMPLAINT FOR DAMAGES |
| v. | JURY OF TWELVE REQUESTED |
| REEDHEIN & ASSOCIATES d/b/a TIMESHARE EXIT TEAM; MAKAYMAX INC.; HEIN & SONS INDUSTRIES, INC.; BRANDON REED, individually; and TREVOR HEIN, individually, | |
| Defendants. | |

COMES NOW PLAINTIFFS Gerald and Patricia Siegrist, individually and on behalf of all others similarly situated, by and through their attorney Gregory Albert of Albert Law PLLC, and brings this class action against the above captioned Defendants for common law fraud, breach of contract, breach of fiduciary duty, unjust enrichment, and numerous violations of the Consumer Protection Act, RCW 19.86 *et seq.*, associated with unfair and deceptive conduct in

**COMPLAINT FOR DAMAGES - 1**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

the marketing and sale of timeshare "exit" services offered to consumers across the United States and Canada. Plaintiffs allege the following on information and belief:

## I.     INTRODUCTION

1.       Reed Hein and Associates, doing business as "Timeshare Exit Team," is a company that had defrauded tens of thousands of customers out of tens of millions of dollars. It falsely advertises it has "specialized knowledge" and a "proprietary process" that allows it to "force" developers and vacation resorts to release customers from unwanted timeshare obligations. Using deceptive statements and false advertisements, it solicits potential customers into meetings with "client advisors," who uniformly advise clients to spend tens thousands of dollars for services Reed Hein does not know how to provide. Reed Hein induces customers into an explicit fiduciary relationship, but rather than put its clients' money in trust or escrow, Reed Hein immediately treats the money as earned revenue and spends it or disburses it as profit to the owners. Reed Hein then "processes" its customers' claims through a variety of convoluted schemes designed to look like they have legal significance they do not have. At the end of the process, Reed Hein tells customers to stop paying their bills and sends customers a letter stating it "exited" them from their timeshare obligations. For the last 7 years, Reed Hein has relied upon the fact that vacation resorts and developers are reluctant to pursue its customers in court because of bad publicity. However, vacation resorts and developers have now begun interfering with Reed Hein's model, creating a backlog of tens of thousands of customers Reed Hein cannot even pretend to service. Vacation resorts and developers have begun targeting Reed Hein customers with lawsuits, which Reed Hein does not disclose to prospective customers. The only legally valid 'exits' Reed Hein customers ever achieve are exits they could, and often do, achieve on their own. Gerald and Patricia Siegrist spent $4,383 on Reid Hein's illusory services without receiving any results.

**COMPLAINT FOR DAMAGES - 2**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

1
2
3

## II.     PARTIES

4

**a.  Plaintiffs**

5      2.      Plaintiffs Gerald and Patricia Siegrist are married. They are residents of

6  Washington State.

7      **b.  Defendants**

8      3.      Defendant **Brandon Reed** was, at all times material to this lawsuit, the co-

9  founder, governor, operator or manager of Reed Hein & Associates. Brandon Reed is also a 60%

10  owner of Reed Hein through a wholly-owned Washington corporation, Makaymax, Inc. in these

11  roles, Brandon Reed directs, controls, participates in, and knowingly approves of the policies,

12  activities, and practices alleged in the Complaint herein. Upon information and belief, Brandon

13  Reed resides in Kirkland, Washington.

14      4.      Defendant **Trevor Hein** was, from Reed Rein's creation through at least

15  approximately July 2016, the co-founder, governor, operator or manager of Reed Hein. In these

16  roles, Trevor Hein directed, controlled, participated in, and knowingly approved of the policies,

17  activities, and practices alleged in the Complaint herein. Trevor Hein is also is or was a 40%

18  owner of Reed Hein through a wholly-owned Delaware corporation, Hein & Sons Industries, Inc.

19  Upon information and belief, Trevor Hein resides in British Columbia, Canada.

20      5.      On information and belief, Defendant **Hein & Sons Industries, Inc.,** is a

21  Delaware corporation incorporated on March 20, 2012. Hein & Sons Industries, Inc., is wholly-

22  owned by Trevor Hein and has been operated by Trevor Hein since its formation as a holding

company.

23      6.      Defendant **Reed Hein** is a limited liability company registered with the Washington

24  Secretary of State. Brandon Reed and Trevor Hein are the registered governing persons of Reed Hein.

25

**COMPLAINT FOR DAMAGES - 3**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

Reed Hein's corporate office is located at 220 120th Ave NE, Bellevue, WA 98005. Upon information and belief, Reed Hein's principal place of business is located at 220 120th Ave NE, Bellevue, WA 98005, and the company's former principal place of business was at 3400 188th St. SW #300, Lynnwood, WA 98037. Upon information and belief, Reed Hein & Associates operates under the trade names "Reed Hein," "Timeshare Exit Team," "TET," "TSET,"and "RHA," and formerly operated under the names "Reed Hein Travel" and "World Travel Seattle." Reed Hein's primary website is timeshareexitteam.com., but Reed Hein formerly maintained a separate reedhein.com website and maintains dozens of other web domains to redirect to timeshareexitteam.com. On information and belief, Reed Hein began operation in 2012.

### III.    JURISDICTION AND VENUE

7.    This Court has personal jurisdiction over Defendants pursuant to RCW 4.28.180, RCW 4.28.185, and RCW 19.86.160 because the acts alleged have been committed in this State and Defendant Reed Hein's principal place of business is located in Bellevue, Washington.

8.    Venue is proper in Snohomish County pursuant to the "Timeshare Owner Exit Agreement" signed by the Plaintiff and ReedHein & Associates, establishing the venue as the Snohomish County Superior Court.

### IV.    FACTUAL ALLEGATIONS

9.    The following allegations are made based on evidence, the parties' own sworn testimony, information, and belief.

10.    Unless indicated otherwise, the following allegations have been ongoing at all times relevant hereto.

11.    Reed Hein & Associates doing business as Timeshare Exit Team describes itself as a company that can "force" timeshare companies (resorts, timeshare brokers, etc.) to forego consumer's timeshare obligation ("timeshare exits"). The company claims to have helped tens of thousands of customers exit their timeshare contracts. In 2018, it claimed a revenue of $38

million and spent approximately $9m in advertising.

12.     Gerald and Patricia Siegrist pay approximately $795.45 per month toward a timeshare obligation with "Wapato Point" Timeshare Company. Mr. and Mrs. Siegrist sought to terminate or significantly reduce this obligation after hearing about Rein Hein's services through its extensive marketing campaign. Mr. and Mrs. Siegrist were deceived by Reid Hein's false advertising and unfair business practices described herein. In January 2016, Mr. and Mrs. Siegrist paid $4,383 to Reed Hein in exchange for the company's services.

13.     According to the power-of-attorney form Reed Hein asked the Siegrists to sign, Reed Hein had "the legal duty to act solely in the interests of [Mr. and Mrs. Siegrist] and to avoid conflicts of interest," which includes keeping Mr. and Mrs. Siegrist's property separate and distinct from any other property owned or controlled by Reed Hein.

14.     According to the power-of-attorney form Reed Hein asked the Siegrists to sign, Reed Hein assumed the role of the Siegrists' fiduciary and all fiduciary duties recognized under Washington State law.

15.     Reed Hein induced the Siegrists into a commercial relationship using materially false statements and omissions of material information.

16.     Reed Hein performed little or no work on Mr. and Mrs. Siegrist's matter.

17.     Reed Hein ignored Mr. and Mrs. Siegrist's reasonable requests for periodic updates.

18.     Reed Hein comingled Mr. and Mrs. Siegrist's property with its own property.

19.     Reed Hein knowingly engaged in conflicts of Mr. and Mrs. Siegrist's interests.

20.     Reed Hein immediately converted Mr. and Mrs. Siegrist's funds into earned revenue before performing work.

21.     Reed Hein failed to notify Mr. and Mrs. Siegrist that it would be unable to process their file for several years.

22.     Reed Hein never "exited" Mr. and Mrs. Siegrist from their timeshare agreement.

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

23.     Reed Hein did not honor its money-back guarantee.

**a.  Brandon Reed's Testimony Shows he and Trevor Hein Began Soliciting Customers in 2012 without Any Plan to Provide Services**

24.     On August 21, 2011, Brandon Reed and Trevor Hein started ReedHein & Company on for the purpose of selling rain gutter protection systems.

25.     In November 2011, Brandon Reed was operating a rain gutter protection booth in British Columbia, Canada, when he observed a busy booth offering to help timeshare owners exit out of their agreements with developers, resorts, and other companies brokering timeshares ("timeshare companies"). Mr. Reed observed they had a "big sign" and "people were lining up." Mr. Reed observed the company running the booth charged an upfront fee without providing an immediate service, which he believed was not honest.

26.     Mr. Reed nevertheless started a business that charged customers an upfront fee to provide timeshare exit services. Mr. Reed acknowledges he "knew nothing about timeshares" at the time. Asked why he began charging upfront fees for services he did not know how to provide, Brandon Reed had the following dialogue under oath:

> Q· Why would you collect a fee before you've done anything for the consumer?
> A·  Yeah. One, that's how we did it in the beginning. I mean, that's how we -- You know, I've been asked that before, like why do we -- When I've been interviewed before in the past, we've, "Why do you charge an upfront fee?" Well, we just -- That's how we did it in the beginning. I don't even remember why we started – we started charging upfront fees, but we did.

27.     On December 31, 2012, "[w]ithin one month" of observing the busy booth, Mr. Reed and Mr. Hein started a company called "ReedHein Travel" in Bellevue, WA with the express purpose of selling timeshare exit services while simultaneously selling timeshares. From August through September 2012, Mr. Reid and Mr. Hein opened a Puyallup Fair booth where they discovered the prospect of their services were popular.

**b.  Beginning in 2013 Defendant ReedHein & Associates Unfairly and With the Intent**

COMPLAINT FOR DAMAGES - 6

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

**to Mislead, Promised Services It Did Not Provide or Know How to Provide**

28.     In 2013, ReedHein Travel changed its name to ReedHein & Associates doing business as Timeshare Exit Team ("TET"). After the experience at the Puyallup Fair Booth, Defendant TET created a website on which they falsely and misleadingly claimed customers could legally "ditch" their timeshares "forever."



29.     Also, the website falsely and misleadingly claimed that Timeshare exit team works with timeshare companies and developers to "dissolve" its customers' contracts.



30.     None of that is true. From 2013-2015, TET provided no service at all. It did not negotiate with timeshare companies. It did not force timeshare companies to forego contracts. TET's initial strategy was to simply tell customers to stop paying their timeshares, which would induce the timeshare companies and developers to foreclose on the customer's product. At that point, Reed Hein would claim it "exited" the customers from their contract. When customers inevitably complained that they could have induced the foreclosures without TET's assistance,

**COMPLAINT FOR DAMAGES - 7**

1    TET's customer service representatives were instructed to tell them "they signed a contract with

2    us and we achieved an exit." Customers complaining that TET offered no services became such

3    a pervasive problem that TET adopted a chapter in its operations manual called: "I Could Have

4    Just Done This on My Own, I want My Money Back."

5        31.    In addition to the foregoing false claims, TET began soliciting business with

6    variations of the phrase "Safe, Legal, and Guaranteed" or "Safe. Legitimate. Guaranteed."

7    Ad · www.timeshareexitteam.com/ ▼    (877) 714-2857

8    **Timeshare Exit Team™ | Safe. Legitimate. Guaranteed.**

9    Give Us a Call Now To Schedule Your Free Consultation! 100% Money Back Guarantee. The
     most trusted **Timeshare Exit** Company in the industry–Endorsed by Dave Ramsey. Nationally
10   Endorsed. Services: **Exit** Preparation, **Exit** Strategy, **Exit** Management, **Exit** Completion.

11       32.    Asked under oath how the timeshare exit services were safe and legal as

12   advertised, Brandon Reed was unable to explain:

13           Q  Those are your advertising terms, aren't they?

14           A  I believe so, yes.

15           Q· Okay.· Well, given that these are the advertising terms that
             Timeshare Exit Team uses, I would expect that Timeshare Exit
16           Team would know what the legal and safe and permanent ways of
             getting somebody out of their timeshare is. So please tell me what
17           they are.

18           A: I'm -- I'm not a lawyer, so our partners –

19           Q.  We understand you're not a lawyer. You do not have to keep
             saying that…But you're running a business that is making these
20           advertising claims. I want to hear from you, who is the president
             and owner of the business --
21
             A  Yes.
22
             Q  -- how it is you can make these claims. What is the basis for
23           these claims?

24           A  Yeah. I'm going to just -- I can't -- Again, I don't know how else
             to say it. I'm not -- I'm not an attorney.
25

**COMPLAINT FOR DAMAGES - 8**                    ALBERT LAW PLLC
                                                 3131 Western Avenue, Suite 410
                                                 Seattle, WA  98121
                                                 Phone: (206) 576-8044

33.     Reed Hein instructs customers like the Siegrists not to communicate with developers at all, falsely telling them that doing will extend the time required to dissolve their contracts. In reality, Reed Hein gives those instructions because communicating directly with the timeshare company might induce the timeshare company to allow the customer out of the contract for free, obviating the need for Reed Hein's fake services. Under oath, Reed Hein officers have given two reasons for that policy, both of which are unfair and deceptive, and neither of which is ever disclosed to the customer. In his deposition, Brandon Reed testified that Reed discourage customers from speaking to timeshare companies or developers because the timeshare companies might share a negative perspective about TET:

> Q· In the third paragraph, the one that starts, "If the timeshare contacts you for any reason"
>
> A· Uhm-hm.
>
> Q· -- "we suggest that you disregard those calls for now, as we do not want you to contact or converse with the timeshare for any reason, as it can undo and/or lengthen the exit process, unless otherwise told to do so…How -- How or why would the timeshare developer talking to its own customer exit them -- prolong the exit process?
>
> A: Because the timeshare companies, the developers would -- again, hating what it is that we do, they – They would just -- They would actually say -- And we know this just because the customers have called on occasion or they've taken a call and are talking about -- You know, talking about us. "Oh, hey, we're working with, you know, Timeshare Exit Team."
>           And it's like all of a sudden, you know, the customer is calling us and saying, "Oh, my gosh. I hear that you're a scam and blah, blah, blah."
>
> Q  Okay. So the reason is that because if they talk to the timeshare developer, the timeshare developer is going to say bad things about you?
>
> A  They do, yes. It was because it was creating a customer service - It was creating problems in customer service. And when your

**COMPLAINT FOR DAMAGES - 9**

customers are calling you and saying, "Hey, my timeshare just said this about you guys," it's just - Imagine having -- I mean, that's…

34.    Alternatively, former TET Chief Operating officer Thomas Parenteau testified the instructions were designed to prevent customers from obtaining an exit without TET, which he acknowledged to be a "good thing" for the customer:

> A.  For a couple of different reasons. We have had experiences where the customer ends up with more than what they own, number one. And, number two, we have had also what I would call consumer confusion where the customer will call the developer and -- after they have retained – you know, they have hired us and all of a sudden, the developer will give them an exit to undermine our services. So that's happened as well.
>
> Q.  Then the second scenario you described, the resort or the developer is offering the customer a way out of the timeshare; right?
>
> A. Correct. Once their hear our name.
>
> Q. What is so bad about that? Isn't that what you want?
>
> A. Actually, yes, it is.
>
> Q. All right. So why would you want to foreclose that possibility?
>
> A. I think we just want to put it on paper that: Listen, if you call the developer, you're going to get confused because they're either going to upgrade you or they're going to let you out.
>
> Q.  Okay.
>   And nowhere in your advertisements or in the materials you give to your customers does it say "Don't call the timeshare resort or developer because they might offer you an exit"?
>
> A.  No.
> Q.  Which you agree would be a good thing?
> A.  Mm-hm.
> Q.  Is that a "yes"?
> A.  Yes.

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

Q.  So why would that be a justification for telling the customers not to call the timeshare resort or developer?

A.  Because it creates customer confusion…Like I said, when they call the developer and as soon as the word "Timeshare Exit Team" is mentioned, the developer offers an exit.

### c.   Reed Hein and TET's Ongoing Deceptive Acts and Practices

35.     **Misleading Inducement**: In addition to its false advertising and false claims that it can "force" timeshare companies to exit their contracts with timeshare owners, TET induces consumers into a relationship by misleadingly offering to let them meet with a "Client Advisor" about their claims. Client Advisors are salespeople trained in sales techniques and TET does not require them to know anything about the timeshare industry. They do not reject customers based on the customers' actual ability to exit timeshares. Client Advisors do not advise customers to do anything other than hire TET. They reiterate the false claim that TET can legally, safely, and permanently get owners out of their timeshare contracts through TET's proprietary system regardless of the customer's circumstance.

36.     **Payments**: In 2013, TET charged between $1,000-$9,000 in fees upfront, depending on the forecasted cost of the timeshare plan the customer sought to exit. Upon information and belief, those fees can exceed $40,000 for some new customers in 2019. The Siegrists have paid TET $4,383. TET accepts money from all customers, regardless of their circumstances or their legal right to exit their timeshare contracts. TET allows customers to pay in installments, but the contract it offers clients does not obligate it to provide any services until the installments are complete.

37.     **Unenforceable Contract:** After inducing a relationship under false auspices, TET asks clients to sign a master services agreement defining a variety of client's obligations while leaving its own obligations too vague to be enforced. According to Reed Hein, the customer is not entitled to a refund unless the customer fulfills its obligations under the contract, including

**COMPLAINT FOR DAMAGES - 11**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

an obligation to pay the timeshare company an indeterminate amount to be released from the contract and the duty to execute a new contract with a third-party law firm, the terms of which are nowhere defined under the Reed Hein contract. The agreement has changed over time, but TET's obligations under the Mr. and Mrs. Siegrist's $4,383 agreement contained only one illusory obligation for TET: "Reed Hein shall work to secure a release from the OWNER's Timeshare."

38.     **Misappropriation of funds**: After receiving money from clients, TET immediately treats it as earned revenue without regard to services rendered or the possibility that TET can even provide the services. Although TET claims to be an agent of the customers, it does not put their money into a trust or escrow account and immediately appropriates the money to itself. In 2019 TET took in approximately $35m in customer fees, all of which it immediately treated as earned revenue.

39.     **Deceptive and Materially Misleading Processes**: After accepting money, TET sends customers' claims through a byzantine process designed to deceive customers into thinking TET is earning its money and achieving results. The processes have taken a variety of forms since 2013. Initially, TET did not directly handle its customers claims, either telling customers to default or sending them to a third-party ("Vendors") for more processing. If the customer defaulted, the timeshare companies would often foreclose on their timeshare ownerships, which TET considered to be an "exit." The Vendors would achieve equally dubious exits in a variety of ways described below. Beginning in 2015, TET attempted to communicate directly with timeshare companies and developers with mixed results. Although TET claims it can "force" the timeshare companies to let customers exit timeshare contracts, TET's communications consist entirely of asking the timeshare companies to voluntarily release customers.

40.     **Lack of Results**: TET continues to advertise its ability to produce results, even though the purported exits are becoming more difficult and often impossible to obtain. Initially, timeshare companies were willing to entertain TET's customers' requests for exits. After

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

discovering TET's business model, timeshare companies have stopped negotiating with any TET customers and have begun suing TET customers for damages – a material fact that TET does not disclose to new customers. In 2019, TET hired a law firm created for the sole purpose of processing TET's claims. Out of 1,200 customer TET sent to the firm in 2019, it was able to exit fewer than 10 timeshare holders.

41.    **False Money-Back Guarantee:** Although TET ostensibly offers a money-back guarantee, the guarantee is illusory and almost never honored. Customers are only entitled to money back if TET is unable to obtain an exit, but whether TET is unable to obtain an exit is unilaterally determined by TET without any clear criteria to guide that determination. After years of processing, TET simply tells customers who demand their money back that more processing is necessary to achieve their exit. Consequently, TET has a backlog of <u>thousands</u> of pre-paid customers that it has never helped and never reimbursed.

42.    **Pyramid Scheme**: TET takes more customers than it exits, leading to a severe backlog of thousands of un-exited customers. Treating all payments as income-instantly-earned, TET does not maintain their money in trust or escrow. Instead it disburses it toward operating costs or profit for Brandon Reed, Trevor Hein, and others. TET maintains an inadequate reserve and it would become instantly insolvent if its backlog of un-exited customers demanded its money back. Instead, TET relies entirely on an influx of new customers to fund its operations and the money-back guarantees.

43.    **False Exits**: When and if the processing ends, TET sends customers a letter claiming the customers "exited" their timeshare agreements. TET's exits often do not constitute a legally cognizable rescission of the timeshare contracts. Instead, TET has historically relied on timeshare company's reluctance to sue timeshare holders because of the negative press, although that has now changed. With the exception of exits voluntarily granted by timeshare companies, often after the customers are left to negotiate for themselves, TET's exits are not legally cognizable. They range from convoluted quitclaim deed schemes to plain falsehoods about

**COMPLAINT FOR DAMAGES - 13**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

whether the client exited their contract.

### 1. Legally Invalid Exits

44.   Reed Hein initially claimed to customers it was able to "force" developers and timeshare companies to take back timeshares, but that is false. In his deposition, Parenteau was directly asked how he "forced" timeshare companies to "take back" timeshare agreements and gave a nonsensical answer:

> Q. So back to my question: In what ways has Reed Hein forced any resort to take any timeshare back?
>
> A. By the methods that we are moving inventory back and out of the customer's name.

Parenteau eventually acknowledged that the methods do not force the timeshare companies to do anything. The only successful exits occur with the consent of the resorts.

### A. Foreclosure or Termination

45.     TET's first strategy was to induce foreclosures or terminations. Despite stating that it can force timeshare companies to "take back" agreements, Reed Hein originally encouraged customers to default on their dues and maintenance fees in order to induce a foreclosure. Depending on the asset, the timeshare company either takes possession of the client's interest in the asset or notifies the customer that the timeshare company is terminating the contract. Then TET considers the foreclosure or notice to be an exit in satisfaction of its contract with the customer. Both outcomes can harm a customer's credit rating and create other negative financial consequences, but Reed Hein has traditionally relied on timeshare companies' unwillingness to suffer adversarial proceedings in court, where their high-pressure sales pitches might be scrutinized by a judge. At some point, TET realized it was exposing itself to claims of tortious interference with a business contract and began advising clients to continue paying their timeshare fees for Reed Hein's own benefit. In 2018, timeshare companies began suing TET for tortious interference and its customers for nonpayment. TET does not notify customers that they

consider an adversarial foreclosure to be an "exit," nor do they notify customer that they might be sued, both of which are material information.

### B. Notices of Resignation

46.     TET falsely claims that it can force timeshare companies to rescind the agreement with "notices of resignation." That is false because 1) the timeshare company's decision to accept the notice is entirely voluntary and 2) timeshare companies no longer accept notices of resignation from TET's customers. A notice of resignation is something any customer can do. It is simply a letter sent to the timeshare company stating that the customer no longer wishes to participate in the program. The timeshare company has the option whether to rescind the agreement. While TET has had some minor success with that approach in the past, timeshare companies no longer agree to rescind contracts with TET customers.

### C. Unenforceable Quitclaim Deeds

47.     TET falsely tells customers it can exit them from their timeshares by executing and recording a quitclaim deed conveying the customer's timeshare interest back to the timeshare company. TET does that without the consent of the timeshare company and it has no legal enforceability. Again, TET simply relies on the timeshare company's reluctance to sue customers.

### D. Quitclaim Deed/Foreclosure Hybrid

48.     TET falsely tells customers it can exit them from timeshares by a combined quitclaim-foreclosure/notice of termination approach. TET pays a vendor to execute a quitclaim deed giving the customer's interest in the timeshare to a third party who then refuses to pay. Like the quitclaim deeds to the timeshare company, the quitclaim deeds to the third party are legally unenforceable. TET simply relies on the timeshare company's reluctance to take customers to court.

### E. Extortion of Customers

49.     Since nonconsensual quitclaim deeds are unenforceable and timeshare companies

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

are becoming increasingly difficult, TET strong-arms its clients into signing illusory quitclaims under the threat they will lose their money-back guarantee if they do not. TET purports to locate third-parties who are willing to take the customer's interest in the timeshare. TET then has the customer execute and notarize transfer paperwork containing blank spaces for the transferees. If the customer refuses to sign the legally incognizable document, TET claims that its duty to exit the customer is discharged and the customer has waved his or her money back guarantee.

### F.   False Claims of Exits

50.     Facing an enormous backlog of un-exited customers, TET resorts to telling customers outright lies. TET sends customers letters notifying them that TET received a confirmation from the timeshare company that it has agreed to exit their contract. TET then sends letters stating they have been "exited" under the terms of its service agreement. And takes no further action. Timeshare companies frequently continue to demand payments and have begun suing TET customers who believed based on information from TET that their timeshare obligations were rescinded. When the customer complains to TET, it claims that it received a "verbal confirmation" from the timeshare company.

### 2.   Deceptive Claims Designed to Induce Reliance

### A.   TET Makes False Claims that Timeshare Obligations Can Be Passed to Children

51.     In Gretchen Morgensen's January 22, 2016 New York Times Article *The Timeshare Hardsell Comes Roaring Back*, Morgensen explained that the timeshare industry purposefully perpetuates the false claim that timeshare obligations and benefits can be passed down to buyers' children. Timeshare Exit Team intentionally contributes to that misunderstanding. As of the date of filing, the company's website includes the following false "answer" to the "frequently asked question" of whether an owner's heir will inherit his or her timeshare interest:

74% of timeshares have consumers in lifetime contracts, many of

**COMPLAINT FOR DAMAGES - 16**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

which have perpetuity commitments. While the issue of inheritance
is a legal one for which you should seek legal counsel, Timeshare
Exit Team understands that some timeshare interests might continue
to burden an owner's heirs or estate after the owner's passing

In October 2014, the company used even less careful language following language:

yes, your kids can inherit your timeshare when you pass away based
on tenancy, whether they want it or not.

### B. TET Acts as a Listing Company While Discouraging Clients from Using Listing Companies

52.     TET profited from the resale of customer's timeshares after discouraging customers to resell their so themselves, which they could have done without the additional expense of a TET agreement. TET stated in its marketing materials and its contracts that it is not a transfer or listing company. TET trained its employees to warn customers about the dangers of listing companies. It warned customers that their assets had no listing value, that listing companies would try to scam them, would collect high upfront fees, and that there was little chance of the timeshare reselling on the market. TET's sales' scripts also criticize transfers to a third party as an exit method. However, the primary way in which TET customers exited their contracts was through the transferring or selling of their timeshares to third parties. TET engages in the same practices it discouraged, except that it collects fees upfront to do it.

### C. TET Creates a Hobson's Choice for Consumers So They Cannot Exit and Cannot Obtain a Refund

53.     TET tells its customers that they did not need to pay maintenance fees and other payments to their timeshare companies. However, transfer companies require TET's customers to be current on payments in order to make a transfer. If TET chooses to use a transfer company, it informs customers that they have 180 days to make their payments for a guaranteed exit. If they do not pay, they forfeit the money-back guarantee that TET advertised. However, customers opting     for     that     method     are     required     to     sign     a     legally     invalid "Exit Agreement Addendum." Under the addendum, TET and the transfer company have an

**COMPLAINT FOR DAMAGES - 17**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

unlimited amount of time to complete the exit while the timeshare obligations remain in the customer's name. That way, TET can force the property owners to maintain their property in perpetuity without ever receiving their money-back guarantee.

### D. After Promising to Negotiate Directly with Timeshare Companies, TET made Customers Negotiate Directly with the Timeshare Companies

54.     Facing an enormous backlog with no coherent plan to discharge its duties, TET directs its customers to file complaints with the Better Business Bureau and state Attorneys General to prompt the timeshare companies to contact the customers. TET directs the customer to negotiate for their own exit using TET's talking points. TET directs them not to inform the timeshare company of its involvement. That method is contrary to TET's claims that it would "work directly" with resorts. In essence, customers pay thousands of dollars to Defendants to negotiate their own exits.

### E. TET Employees Do Not Possess the Expertise It Advertises

55.     Brandon Reed testified that he knew "nothing" about timeshares when he started TET. As early as December 2013, Defendants advertised that "[w]e are industry experts in relieving people of their timeshare commitments." Neither had any experience or training in performing timeshare exits, and they did not hire internal personnel who did. Brandon Reed has testified under oath in other litigation that Reed Hein' s business model from inception was to outsource all exit work to third-party Vendors.

56.     Defendants only began attempting "internal" (i.e., non-Vendor) exits in approximately 2015, and even this was limited to contacting Resorts about voluntary surrender programs for unwanted timeshares-which the customer could have done for free. The employees making these contacts, including Reed Rein's former office manager, had no specialized training or experience. Only in 2016 did Defendants hire contractors or employees with backgrounds in the timeshare industry to attempt to negotiate exits with Resorts, and only then as a "secondary"

measure as Defendants continued to outsource first to Vendors.

**F.   Defendants' Advertised Money-Back Guarantee Is Deceptive and Illusory**

57.   The fine print of the Money-Back Guarantee has varied over time, but in every version Reed Hein attaches numerous caveats and qualifications that allow the company to avoid paying a refund at its discretion, which Reed Hein exercises in almost any circumstance to deny payment. Defendants' contractual small print does not correct the deceptive net impression created by its website and marketing materials.

58.   Defendants have consistently interpreted the Money-Back Guarantee so that Reed Hein does not have to perform any deliverables in any specific span of time. Reed Hein will then use that as a basis to deny customers a refund and claim that Reed Hein is still working on a customer's file or that an exit may be forthcoming. Even now, the current fine print of the Guarantee only renders a customer "eligible" for a refund if three years have passed.

59.   Defendants also build in a variety of devices designed to void the Money-Back Guarantee:

b.   Reed Hein voids the Guarantee if it has any exit offer, regardless of cost or form. Defendants interpret this to include if a customer rejects one of its Vendors, even if the timeshare company has never been contacted.

c.   Reed Hein also voids its Money-Back Guarantee if the customer fails in its "duties," such as continuing to pay timeshare fees, even if Reed Hein advised the customer not to pay.

d.   The most recent version of the Money-Back Guarantee declares the Guarantee void if the customer achieves their own exit: meaning that Defendants are entitled to keep the customer's funds even if they never did any work.

e.   A Reed Hein internal policy manual states that, "we do not offer refunds for . . . cancellations" of its customer contracts entered between approximately 2016 and

**COMPLAINT FOR DAMAGES - 19**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

early 2019, which include the Money-Back Guarantee.

60.    In practice, Defendants' refund policy is that customers are not entitled to their full money back unless and until Reed Hein (in its sole discretion) determines that it is unable to obtain an exit. Defendants regularly deny requests for full refunds on the basis that Reed Hein has already begun work, and do not proactively refund money even if the exit has gone undelivered for years. Reed Hein typically does not honor its 100% Money-Back Guarantee unless the customer threatens to complain to a third party, such as the news media or the Washington State Attorney General's Office. Reed Hein has even conditioned refunds on customers taking down negative reviews or complaints online.

### G.    TET Creates the Deceptive Impression that Reed Hein is a Law Firm and Misrepresent that Reed Hein Performs "Consumer Protection"

61.    Defendants' marketing and branding create a deceptive net impression that Reed Hein is a law firm and/or that Reed Hein employs in-house attorneys with timeshare expertise. Reed Hein has no actual attorney "associates" and the only attorneys on Reed Hein's payroll serve as corporate counsel. On information and belief, representatives of Reed Hein have also directly made misrepresentations to this effect.

62.    Defendants' sales scripts and presentations also reinforced this impression. Scripts referred to "Our Attorneys - They are consumer advocate attorneys," and did not specify that any attorneys used are Vendors.

63.    Representations made by Defendants on reedhein.com and timeshareexitteam.com bolster the misimpression that Reed Hein is a law firm or has in-house timeshare attorneys. Timeshareexitteam.com routinely referred to Reed Hein as a "firm" employing "consumer advocates" for the benefit of "clients." Through at least September 2014, reedhein.com specifically advertised "expertise" in, among other things, the legal fields of "Mortgage Mediation" and "Automotive Contracts." Through at least May of 2015, Reedhein.com also stated that Defendants protect[ed] consumers "when they are misled by false

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

advertising, deceptive sales practices, defective products, and various other unfair trade practices."

64.    Reedhein.com also stated that Defendants "represent consumers," who are referred to as "our firm's clients," and claimed that Defendants' services included "preparing the strongest case for you."

65.    Defendants did not add language to their website disclaiming that Reed Hein was a law firm until sometime after September 2015 (in small print), and did not add a similar disclaimer to their contracts until February 2016 or later.

66.    Defendants further create the impression that they are lawyers after they are hired; Reed Hein employees were trained not to disclose the names of attorneys or that these attorneys were third-party Vendors. In customer communications, employees routinely referred to Vendor attorneys as "the attorney," "our attorney," or "your attorney." Defendants also insert Reed Hein personnel between the customer and any attorney, telling the customer that they must liaise with the attorney through their Reed Hein representatives.

61.    At least some of Defendants' customers understood Reed Hein to be a law firm or to have lawyers on staff when they retained Defendants' services.

62.    Also central to Defendants' marketing is the representation that Reed Hein is a "Consumer Protection Firm" or "Consumer Protection Group" employing a team of "consumer advocates" to look out for consumer interests.

63.    In using these terms, Defendants create the impression that Reed Hein is performing work to protect consumers or redress consumer harm. Reed Hein further bolsters this impression by trading on public perception of the timeshare industry and stating that Resorts are victimizing consumers.

64.    Contrary to these repeated representations, Reed Rein's sole work consists of selling timeshare exit services for profit. The "Client Advisors" who sign up Reed Hein's customers are commissioned salespeople whose compensation was (through January 2018) based

**COMPLAINT FOR DAMAGES - 21**

solely on the sales they closed. As Reed Hein' s corporate representative conceded in a recent deposition, Reed Hein's "goal ... is to sell as many exits as possible and generate as much revenue and income as possible."

### H.  Defendants Manipulate Online Reviews to Create Positive Perception of Reed Hein's Abilities and Services

67.     Defendants also manipulate online reviews of Reed Hein's services in order to attract and maintain customers and discredit negative commentary by unhappy customers. This includes having employees pose as satisfied customers online and leave fabricated reviews describing positive experiences with Reed Hein.

68.     Defendants further manipulate online reviews by hosting a false and deceptive online review aggregator on the timeshareexitteam.com website. Defendants' "Timeshare Exit Team review summary" purports to aggregate 1-star (Bad) through 5-star (Excellent) reviews from Google.com, Trustpilot.com, and Birdeye.com but omits more than two hundred negative (i.e., 1- and 2-star) reviews posted to those review websites. Through this deceptive "review summary," Defendants falsely represent and/or create the impression that no negative reviews of the company exist, when in fact hundreds of such reviews have been posted online including approximately one hundred 1- and 2-star reviews on the Better Business Bureau's website.

69.     Reed Hein also specifically misrepresented for several years that they had no complaints with the Better Business Bureau or the Washington State Attorney General's Office, or any other form of "action" from a U.S. or Canadian government agency. This misrepresentation, which was included in contracts signed by Reed Hein customers through at least May 2016, was untrue by as early as 2014.

### I.  Defendants Make Specific Misrepresentations to Consumers During Sales Presentations

70.     Defendants present their salespeople as having expertise in the timeshare industry and Reed Hein' s "proprietary" exit process. In fact, the salespeople are not required to have any

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

timeshare-related experience and are not even told how Reed Hein obtains the exits.

71.     Defendants advertise that their significant fee is a onetime cost (except for a potential resort-required settlement fee), compared to perpetual Resort fees. However, Reed Hein does not disclose that it may later ask for more money if the exit opportunity it obtains requires additional payments to a third-party Vendor, claiming this is allowed under their contracts because the money is not going to Reed Hein. Furthermore, Reed Hein now requires that customers keep paying for-but not use-the timeshare; customers must pay Reed Rein's fee and the Resort fees for the duration of the exit process, without the enjoyment of their timeshare.

72.     Reed Rein's fee calculation itself is deceptive: Customers are falsely told the fee is calculated based on the work necessary to obtain an exit. Instead, Reed Rein's fee is based on a formula designed to appear palatable to the potential customer when compared to the amount of the customers' annual timeshare and maintenance fees, and the remaining amount of any mortgage or other encumbrance.

### 3.  Material Omissions and Active Concealment of Material Facts

#### A.  TET Declines to Notify Customers that Timeshare Companies Have Begun Suing Its Customers

73.     Timeshare companies have been unwilling to sue timeshare holders who default because it would expose their sales and negotiation tactics. Since 2013, TET's alleged "exits" merely consisted of legally invalid quitclaim deeds and other form of nonpayment, relying on the timeshare companies' unwillingness to file suit. As late as 2018, timeshare companies began filing suit against TET customers. TET does not disclose to future customers the possibility that they might be sued or the reality that its current customers are being sued.

#### B.  TET Fails to Disclose and Actively Conceals the Extent that Its Services Will Be Outsourced

65.     In most cases Defendants immediately determine that the customer's exit will be

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

outsourced, but Defendants will often conceal or fail to disclose the Vendor's involvement unless or until the Vendor's exit process necessitates disclosure, such as if the Vendor wants legal documents executed.

66.     In assigning a Vendor, Defendants do not discriminate based on the qualities or merits of the case. Instead, 95% of the time, Defendants decide whether the file should go to an attorney Vendor or non-attorney Vendor based solely on whether the timeshare is encumbered.

67.     Reed Hein has also broken ties with several of its Vendors, which often leaves Defendants without a mechanism to affect the desired exit. During such periods, Defendants continue to sign up customers for services but do not inform the customers that no work will be done toward their timeshare exit until Reed Hein can locate a new Vendor. For example, for several months in late 2018, Defendants did not have an attorney Vendor to whom they could send incoming Reed Hein customers, after cutting off new assignments to all their existing attorney Vendors. Reed Hein nevertheless continued to take on customers with encumbered timeshares, without informing them that that no action would be taken on their exits until Reed Hein located a new Vendor. Reed Hein ultimately had to restore its relationship with a prior Vendor who had previously sued Reed Hein for breach of contract for failing to send enough customer files to start work on exits.

68.     Reed Hein would not necessarily tell their customers that work by an attorney (let alone a third party) was contemplated for their exit, and salespersons were trained to convey Reed Hein's hope that no attorney would be necessary. In many instances, Reed Hein neglected to obtain a power of attorney before hiring a Vendor attorney on the customer's behalf, or allowed a power of attorney to lapse before hiring one. Customers have complained to Reed Hein, demanding a refund, on the basis that they did not realize Reed Hein would be hiring an unknown third party.

69.     In many cases, TET directed and trained its employees not to reveal the identity of its Vendors to customers, even in circumstances where they were permitted to indicate a

COMPLAINT FOR DAMAGES - 24

Vendor was being used. Employees also referred to Vendors in communications with customers as though the Vendors were in-house personnel.

70.     Where there is a Vendor contract, Defendants sometimes build in a provision barring the Vendor from speaking to Reed Rein's customers. When one of Reed Rein's Vendor attorneys began interacting with customers and sending them direct communications, including an outline of Reed Rein's fee arrangement with the attorney, Defendants advised those customers that the communications were "a formality" or should be ignored.

71.     Attorney Vendors send representation letters to Resorts indicating the customer (not Reed Hein) has retained the attorney to seek an exit of the timeshare. Attorneys send these letters even when the customer does not know the attorney's identity or even that the attorney has been retained. This is despite the fact that some of Reed Hein's attorney Vendor contracts explicitly provided that Reed Hein customers would not have an attorney-client relationship with the attorney and barred Reed Hein from implying that the attorney Vendor represented the customer.

72.     Defendants internally recognized that Reed Hein's contracts with customers did not provide for Reed Hein to outsource exit services to a third-party Vendor. Reed Hein employees were instructed in approximately April 2018 that they could direct customers to an assignment provision in the contract as a basis for authority to outsource the exits, and "reset customer expectations" about third-party Vendors accordingly. Defendants only revised their contract to permit outsourcing of exit services in 2019, after commencement of the State's pre-litigation investigation.

**4.     Additional Unfair Acts and Practices**

    **A.     Defendants Further Manipulate Customers Through Deceptive Offers of Credit Repair Services**

73.     On information and belief, Defendants represent to consumers that Defendants will preserve the consumer's credit record, history, or rating, or assist in repairing the consumer's

**COMPLAINT FOR DAMAGES - 25**

credit if it should be negatively impacted by Reed Rein's exit process.

74.     Beginning as early as September 2014, Defendants represented directly via reedhein.com that Reed Hein had expertise in credit repair services. This representation was made continually through at least May 2015.

75.     Beginning as early as 2016, Defendants began representing directly to customers that Reed Hein would provide credit repair services where necessary as part of the exit services customer's paid Reed Hein to perform, or negotiate directly with Resorts to have the Resorts withdraw any negative credit reporting. On information and belief, Defendants continued to claim that Reed Hein would provide assistance or help with credit repair as part of Reed Rein's services through at least December 2018.

76.     On information and belief, despite promising credit repair to incoming customers as part of Reed Hein' s services, Defendants began refusing to provide such services in approximately March of 2018. Defendants acknowledged to customers that these services were promised but informed them that Reed Hein did not offer credit repair "anymore."

### 1.  Defendants Never Provided the Advertised Credit Repair and Instead Hired Vendors

77.     Although Defendants created the impression that Reed Hein itself would provide credit repair services, these services were provided by third party Vendors, if at all. On occasions where Defendants actually disclosed that a third-party Vendor would be involved, usually after a customer hired Reed Hein, Defendants reserved sole discretion to select the Vendor.

78.     On information and belief, as with their exit Vendors, no written contracts governed Reed Hein's relationship with the credit repair companies. Additionally, on information and belief, no contracts were entered between the customer and the credit repair companies. The entire arrangement was governed by verbal agreements between Defendants and their Vendors, undisclosed to Reed Rein's customers.

**COMPLAINT FOR DAMAGES - 26**

### 2. Defendants Do Not Comply with Statutory Requirements for Credit Services Organizations

79.     In association with their advertised services, including credit repair, Defendants offer a three-day cancellation policy in exchange for a full refund. Defendants' contracts do not include any statement, conspicuous or otherwise, regarding a customer's right to cancel the contract at any time prior to midnight of the fifth day after the date of the transaction, or any reference to an attached notice of cancellation form to be completed in such event. No such attached cancellation form is provided.

80.     In association with their advertised services, including credit repair, Defendants' contracts do not specify the total of all payments to be made by the customer. Instead, the contracts specify Defendants' initial fees, and provide the customer may be required to pay unspecified transfer or settlement fees in the future.

81.     In association with their advertised services, including credit repair, Defendants charge customers prior to full and complete performance of the services Reed Hein has agreed to provide. On information and belief, Defendants have not obtained a surety bond in any amount from a surety company admitted to do business in Washington with respect to credit repair services. On information and belief, nor have Defendants established a trust account at a federally insured bank with respect to their advertised credit repair services.

82.     In association with their advertised services, including credit repair, Defendants do not provide customers with any written statements reflecting the information set forth in RCW 19.134.050 and, as such, Defendants do not keep any signed acknowledgments of the customer's receipt of these written statements on file.

### 3. Defendants Mislead Consumers in Performance of Debt Adjustment Services

83.     Defendants explicitly adjust consumer debt in the context of selling services to release consumers from mortgaged or otherwise encumbered timeshare interests. Defendants'

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

marketing recognizes that Defendants' services represent the adjustment of consumer debt, characterizing timeshare ownership as "debt" and "perpetual liability." Despite this recognition, Defendants routinely engage in acts prohibited for debt adjusters:

84.     Defendants' fees, which they attempt to collect upfront, are in the range of thousands of dollars, far in excess of the twenty-five-dollar initial fee permissible to debt adjusters. Defendants also regularly charge more than fifteen percent of the total debt owed to the mortgagor, including charging a "base price calculated at 30% of [the] mortgage amount" to resolve "[a]ny mortgage over $30,001."

85.     Because Defendants actively conceal from Resorts that customers have hired Reed Hein, Reed Hein routinely fails to notify its customers' creditors (the Resorts) of the retention of its services. Reed Hein also fails to provide a monthly accounting to its customers of any kind.

86.     Defendants improperly fail to include in their contracts the provisions mandated by RCW 18.28.100(7), and fail to hold payments received from customers in a separate trust account or make payments on behalf of customers from that account.

87.     Defendants also improperly pay a $150 referral fee to customers to refer other prospective customers to Reed Hein for services which include debt adjustment services.

88.     Lastly, Defendants' Powers of Attorney, which specifically allow Reed Hein or its employees to negotiate "Timeshare Interest/ Debt" and settle with customers' secured creditors, improperly authorize Defendants to employ or terminate the services of attorneys or arrange the terms of or compensate for the services of attorneys on behalf of Reed Hein' s customers.

**B. TET Falsely Asserts That Communications Between TET and its Customers Are Protected by Attorney-Client Privilege**

89.     Reed Hein executes Power-of-Attorney agreements with their customers. Under those agreements, Reed Hein asserted that it "acts as an agent pursuant to the POA agreements

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

when it hires law firms or transfers companies . . . and when it communicates and interacts with the law firms on behalf of the Reed Hein customers." Reed Hein further asserted that "If Reed Hein decides to hire a law firm for a customer, Reed Hein and the law firms specifically intend to create a relationship under privileged material is freely exchanged. As such, the law firms, customers, and Reed Hein all intend that the attorney-client and work product privileges and protections apply to all three parties in this agency relationship – the law firms, the customers/clients, and Reed Hein."

90.     However, Reed Hein knows a federal court in 2018 held that the communications and work product between those entities were not subject to attorney-client privilege or the work product doctrine. After that ruling, Reed Hein continued to assert after the ruling that those communications and work product were subject to attorney-client privilege and work product privileges.

## V.     CLASS ACTION ALLEGATIONS

91.     Plaintiffs bring this action pursuant to Civil Rule 23(a) and 23(b)(1), (b)(2) and/or (b)(3) on behalf of the following Class for the maximum time period allowable by law:

> **Class 1:** all persons who entered into contracts with Defendants whose funds were treated as money-earned and received legally invalid exits from their timeshare agreements or were not exited from their timeshares at all.

92.     The Class is so numerous that joinder of all members is impracticable.

93.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

94.     Plaintiffs' claims are typical of the claims of each member of the Class.

95.     There are questions of law and fact common to the Class, the answers to which will advance the resolution of the claims of all the Class' members and that include, without limitation:

**COMPLAINT FOR DAMAGES - 29**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

a.  Whether Defendants misappropriated client funds in violation of their contracts, duties, and fiduciary duties

b.  Whether Defendants induced customers into contracts with promises of being able to legally stop making payments on their timeshares;

c.  Whether Defendants asserted that their conversations with customers and legal counsel were privileged when they knew or should have known of a court order stating that those communications were not privileged;

d.  Whether the Defendants breached the implied covenant of good faith and fair dealing;

e.  Whether Defendants made materially false representations to Plaintiffs and the Class;

f.  Whether Defendants made materially false representations about their knowledge and experience in the timeshare industry;

g.  Whether Defendants failed to abide by the statutes and regulations for crediting organizations;

h.  Whether Defendants materially misled consumers in performance of debt adjustment services;

i.  Whether Defendants made material misrepresentations about the speed of exit services;

j.  Whether Defendants failed to provide exit services for Plaintiffs and the Class;

k.  Whether Defendants' business practices alleged herein are deceptive acts or practices;

l.  Whether Defendants breached their fiduciary duty to Plaintiffs and members of the Class

m.  Whether Defendants are liable to Plaintiffs and the Class for damages and, if so, the measure of such damages;

n.  And whether Plaintiffs and the Class are entitled to declaratory, injunctive, and other equitable relief.

96.  Plaintiffs are members of Class 1 and will fairly and adequately represent and protect the interests of the Class. Plaintiffs have no claims antagonistic to those of the Class.

**COMPLAINT FOR DAMAGES - 30**

Plaintiffs' counsel will fairly, adequately and vigorously protect the interests of the Class.

97.     Class action status is warranted under CR 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants.

98.     Class action status is warranted under CR 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

99.     Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

100.    Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

101.    **Class Counsel** – Plaintiffs have retained counsel who have been interviewing witnesses and researching these underlying issues for twelve months before filing suit. Counsel are experienced in plaintiffs' litigation and will represent the Class fairly, adequately, and zealously.

## VI.    CLAIMS FOR RELIEF

### COUNT ONE
### BREACH OF CONTRACT INCLUDING BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

102.    Plaintiffs re-allege the facts in this complaint as if set forth more fully herein.

**COMPLAINT FOR DAMAGES - 31**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

103.     Every contract contains an implied covenant of good faith and fair dealing.

104.     Defendants induced customers into contracts unfairly and in bad faith by using false claims and promises.

105.     Defendants breached the terms of the spirit of its contracts with customers.

106.     As a direct, proximate, and legal result of the breaches, Plaintiffs and members of the Class have suffered damages in an amount to be proven at trial.

**COUNT TWO**
**COMMON LAW FRAUD**

107.     Defendants induced customers to spend money on its services by making materially false representations and omitting material facts with the intent that the false statements and omitted facts be acted upon.

108.     Plaintiffs, including the Class, were ignorant of or would not be expected to know the truth of the material misrepresentations and material omissions.

109.     Plaintiffs relied on the truth of Defendants' misrepresentations and trusted that there were no material omissions.

110.     Plaintiffs suffered damages as a result of their reliance.

**COUNT THREE**
**UNJUST ENRICHMENT/DISGORGEMENT**

111.     Plaintiffs re-allege the facts in this complaint as if set forth more fully herein.

112.     Plaintiffs and Class have conferred a substantial benefit upon Defendants derived from the fees paid by Plaintiff and the Class.

113.     Those payments were accepted and retained by Defendants under circumstances such that it would be inequitable for Defendants to retain the benefit without payment to Plaintiff and members of the Class.

114.     As a result of Defendants' unjust enrichment, Plaintiffs and the Class have

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

sustained damages in an amount to be determined at trial and seek full disgorgement and restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

115.     Plaintiff and the Class also seek restitution and disgorgement of profits realized by Defendants as a result of their unfair, unlawful, and/or deceptive practices.

## COUNT FOUR
## VIOLATION OF CONSUMER PROTECTION ACT, RCW 19.86 *et. seq.*

116.     Plaintiffs re-allege the facts in this complaint as if set forth more fully herein.

117.     Plaintiffs can prevail on a claim for damages under the State Consumer Protection Act by establishing (1) an unfair or deceptive act or practice, (2) that occurred in the conduct of trade or commerce, (3) that has an impact on the public interest, (4) that results in injury to the plaintiffs in their business or property, and (5) causation. *Klem v. Washington Mut. Bank*, 176 Wash.2d 451 (1992).

118.     Defendants commits an unfair or deceptive act or practice by promising to hold customers funds separate and apart from company's funds, when the company in fact converted Plaintiffs' funds into its own funds.

119.     Because Defendants committed the unfair or deceptive acts or practices as part of a transaction, the acts or practice occurred in the conduct of trade or commerce.

120.     Because Defendants has presented the same power-of-attorney form to tens of thousands of customers, and because the company has in fact converted the funds of all those customers into its own funds, the company's unfair or deceptive act or practice as an impact on the public interest.

121.     Defendants engaged in the following acts or practices constituting unfair or deceptive acts in trade or commerce:

   a.   Misrepresenting, directly or indirectly, that Reed Hein terminates consumers' obligations with respect to their timeshares by forcing Resorts to cancel or annul

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

timeshare contracts or take back the timeshare;

b.   Misrepresenting, directly or indirectly, that Reed Hein negotiates directly with Resorts to terminate consumers' obligations with respect to their timeshares;

c.   Misrepresenting, directly or indirectly, that Reed Hein itself will perform services toward terminating consumers' obligations with respect to their timeshares, rather than through the use of third-party Vendors;

d.   Outsourcing services performed for Reed Hein customers to third-party Vendors where the customer's contract with Reed Hein did not provide for Reed Hein to hire a third party or assign responsibility for performance of the services in the contract;

e.   Outsourcing services performed for Reed Hein customers to third-party Vendors with whom Reed Hein and/or the customer does not have a contract;

f.   Misrepresenting, directly or indirectly, that Reed Hein personnel have performed services toward terminating consumers' obligations with respect to their timeshares when any services have in fact been performed by a Vendor;

g.   Failing to supervise and maintain oversight over services performed by Vendors where the customer contracted with Reed Hein to receive such services;

h.   Delivering services to customers that are legally ineffective at terminating the customers' obligations with respect to their timeshare;

i.   Delivering services to customers that create the risk of legal action against customers for invalid transfers of their timeshare;

j.   Interpreting foreclosure and/or Notice of Termination for nonpayment as a successful termination of customers' obligations with respect to their timeshare without disclosing this interpretation to customers at the point of sale;

k.   Misrepresenting, directly or indirectly, that customers' obligations with respect to their timeshare have been terminated when they have not been;

**COMPLAINT FOR DAMAGES - 34**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

l.  Misrepresenting, directly or indirectly, that customers' obligations with respect to their timeshare have been terminated when Defendants know or should know the Resort does not recognize the termination;

m.  Misrepresenting, directly or indirectly, that Reed Hein has made progress toward and/or performed services toward terminating a customer's obligations with respect to their timeshare when no such services have been performed;

n.  Misrepresenting, directly or indirectly, that Reed Hein does not obtain proceeds from the sale of a customer's timeshare to a third party;

o.  Misrepresenting, directly or indirectly, that Reed Hein would perform services toward terminating customers' obligations with respect to encumbered timeshares during periods when Reed Hein was not providing services or outsourcing services on encumbered timeshares to Vendors;

p.  Misrepresenting, directly or indirectly, that Reed Hein has developed relationships with Resorts that facilitate termination of customers' obligations with respect to timeshares;

q.  Misrepresenting, directly or indirectly, that consumers will not face negative consequences if they cease making payments to Resorts with respect to their timeshares;

r.  Impeding customers' communications with Resorts with respect to the customers' obligations regarding their timeshares, including payment obligations;

s.  Misrepresenting, directly or indirectly, that Reed Hein' s services do not present any risk to customers, including but not limited to risk of foreclosure by Resorts with respect to customers' timeshares;

t.  Misrepresenting, directly or indirectly, that Defendants have expertise, trade secrets, or unique or proprietary strategies and methods that Reed Hein will

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

employ toward terminating consumers' obligations with respect to their timeshares;

u.  Misrepresenting, directly or indirectly, that Reed Hein will terminate consumers' obligations with respect to their timeshare safely, legitimately, legally, permanently, or forever;

v.  Giving customers the deceptive net impression that Reed Hein has local and/or region-specific expertise;

w.  Misrepresenting, directly or indirectly, that Reed Rein's fees are calculated based on the services required to terminate a customers' obligations with respect to their timeshare;

x.  Misrepresenting, directly or indirectly, that Reed Hein has a 100% success rate and/ or the highest success rate in the industry;

y.  Creating the deceptive net impression that Reed Hein can terminate any customer's obligations with respect to their timeshare, regardless of circumstances;

z.  Misrepresenting, directly or indirectly, that consumers who hire Reed Hein will not have to make further payments to Resorts with respect to their timeshares;

aa. Misrepresenting, directly or indirectly, the amount of time that it will take for Reed Hein to terminate customers' obligations with respect to their timeshare;

bb. Misrepresenting, directly or indirectly, or creating the deceptive net impression that Reed Hein is a law firm and/or Reed Hein performs "consumer protection" services;

cc. Misrepresenting, directly or indirectly, or creating the deceptive net impression that Reed Hein employs in-house attorneys who perform services to terminate consumers' obligations with respect to their timeshares;

dd. Misrepresenting, directly or indirectly, that no complaints about Reed Hein had

**COMPLAINT FOR DAMAGES - 36**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

been filed with the Better Business Bureau or the Washington State Attorney General's Office, or that Reed Hein had not been the subject of any other form of "action" from a U.S. or Canadian government agency;

ee. Manipulating online reviews of Reed Hein by having Reed Hein representatives pose as satisfied customers and leave fabricated reviews;

ff. Displaying an online review summary on timeshareexitteam.com which omits 1- and 2- star reviews from the summarized review sources;

gg. Misrepresenting, directly or indirectly, that terminations of a customers' obligations with respect to their timeshares were the result of services provided by Reed Hein when Defendants know that Reed Hein had not provided services resulting in the termination;

hh. Forming contracts with customers who own timeshares with Resorts on Reed Rein's internal "Do Not Take" list;

ii. Requiring customers to sign "Exit Agreement Addendums," which substantially change the terms of the customers' contract with Reed Hein, under threat of voiding Defendants' Money-Back Guarantee;

jj. Creating the deceptive net impression that Defendants' Money-Back Guarantee entitles customers to a full refund of fees paid to Reed Hein if dissatisfied with Reed Hein' s services;

kk. Offering a Money-Back Guarantee that may be voided if Reed Hein offers to terminate a customer's timeshare interest through a method rejected by the customer because the method does not correspond the methods described in Reed Hein' s marketing or representations at sales presentations;

ll. Offering a Money-Back Guarantee that permits Reed Hein to refuse to refund customers' payments if Reed Hein expresses an intent to continue to attempt performance under the contract where the Money-Back Guarantee does not

**COMPLAINT FOR DAMAGES - 37**

require Reed Hein to perform within a specified amount of time;

mm.     Refusing to honor the Money-Back Guarantee in circumstances where the basis to void the Guarantee was the customer's failure to pay the Resort at Defendants' direction;

nn. Conditioning honoring the Money-Back Guarantee on a customer's withdrawal of public negative reviews or complaints to third parties;

oo. Misrepresenting, directly or indirectly, that consumers face no risk of credit damage from Reed Rein's services; and

pp. Misrepresenting, directly or indirectly, that Reed Hein provides credit repair services when Reed Hein later refuses to provide such services.

122.    Defendants' practices outlined above affects the public interest and have the capacity to deceive a substantial number of consumers and are unfair or deceptive acts or practices in trade or commerce in violation of RCW 19.86.020.

123.    The unfair or deceptive act or practices have harmed Plaintiffs and the Class in their business or property.

124.    The unfair or deceptive practice act or practice proximately caused Plaintiff and the Class' injuries.

125.    This Court has authority to award treble damages, up to a maximum of $25,000, to any person who establishes that he or she was injured because of a violation of the State Consumer Protection Act. RCW 19.86.090.

126.    A person who establishes that he or she was injured because of a violation of the State Consumer Protection Act is entitled to the reasonable attorney fees and costs he or she incurred in bringing the suit. RCW 19.86.090.

127.    The Court should award treble damages to the Plaintiffs and each member of the Class.

**COMPLAINT FOR DAMAGES - 38**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

**COUNT FIVE**
**BREACH OF FIDUCIARY DUTIES**

128.    Defendants induced Plaintiffs, including the Class into fiduciary relationships by asking them for power of attorney and soliciting money for services not yet performed.

129.    Defendants received money from Plaintiffs and the Class for services not yet performed, but did not hold the money in trust or escrow.

130.    Defendants immediately misappropriated the money as earned income.

131.    Defendants breached its fiduciary duties to Plaintiffs and the Class.

**VII.    PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs pray that this Court grant the following relief:

132.    That the Court issue a preliminary injunction enjoining and restraining Defendants and their representatives, officers, agents, servants, employees, and all other persons acting or claiming to act for, on behalf of, or in active concert or participation with Defendants offering or selling the Timeshare Exit Services described herein until such further order of the Court.

133.    That the Court adjudge and decree that Defendants have engaged in the conduct complained herein.

134.    That the Court adjudge and decree that the conduct complained of herein in constitutes unfair or deceptive acts or practices in violations of the Consumer Protection Act, Chapter 19.86 RCW.

135.    That the Court make such orders pursuant to RCW 19.86.080 as it deems appropriate to provide that Plaintiffs have and recover from Defendants the costs of this action, including reasonable attorneys' fees.

136.    That the Court order such other relief as it may deem just and proper to fully and effectively dissipate the effects of the conduct complained herein, or which may otherwise seem proper to the Court.

**COMPLAINT FOR DAMAGES - 39**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

137.   Monetary Relief, including Damages and Treble damages.

138.   Attorney Fees and Costs.

139.   Any other monetary and nonmonetary relief the Court deems just and proper.


DATED this 15th day of April,  2021.

ALBERT LAW PLLC


By: _____
Gregory Albert, WSBA#: 42673
3131 Western Ave., Suite 410
Seattle, WA 98121
Telephone: (206)-576-8044
Email: greg@albertlawpllc.com
*Attorney for Plaintiffs*

**COMPLAINT FOR DAMAGES - 40**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044